1 │ JOSEPH S. LEVENTHAL (221043)
joseph.leventhal@dinsmore.com
2 │ DINSMORE & SHOHL LLP
655 W. Broadway, Suite 840
3 │ San Diego, California  92101
Telephone:  (619) 400-0500
4 │ Facsimile:  (619) 400-0501

5 │ *Attorneys for Plaintiff*
*HealthyWage LLC*

6 │

7 │ **UNITED STATES DISTRICT COURT**

8 │ **SOUTHERN DISTRICT OF CALIFORNIA**

9 │ HEALTHYWAGE LLC, a Delaware
Limited Liability Company,

Case No.   **'17 CV 1041 W     BLM**

10 │              Plaintiff,

**PLAINTIFF HEALTHYWAGE LLC'S
COMPLAINT FOR:**

11 │      v.

12 │ MOHIT JAGETIA, an individual, and
TEKPALETTE, an Indian Company,

13 │              Defendants.

**1.  BREACH OF CONTRACT;**

**2.  INTENTIONAL
    MISREPRESENTATION;**

**3.  NEGLIGENT
    MISREPRESENTATION;**

14 │

15 │ **4.  NEGLIGENCE;**

16 │ **5.  DECLARATORY JUDGMENT.**

17 │ **DEMAND FOR JURY TRIAL**

18 │

19 │      Plaintiff HealthyWage LLC ("HealthyWage") hereby alleges as follows:

20 │      1.      This action arises out of a series of agreements between HealthyWage

21 │ and Defendant Mohit Jagetia ("Jagetia"), and between Jagetia and Defendant

1   Tekpalette ("Tekpalette"; Jagetia and Tekpalette, collectively, referred to herein as

2   the "Defendants"; the Defendants and HealthyWage, collectively, referred to herein

3   as the "Parties").   HealthyWage produces corporate and consumer wellness

4   programs.   It hired Jagetia to maintain and enhance HealthyWage's Website.

5   Jagetia subcontracted some of the work to Tekpalette.   Under a series of

6   agreements, Jagetia and Tekpalette agreed to provide services and product to

7   HealthyWage that met industry standards in exchange for payment.   Not only did

8   Defendants breach these agreements by providing substandard product to

9   HealthyWage, Jagetia additionally intentionally misled HealthyWage regarding the

10   quality of and improvements he would make to the Defendants' work product to

11   induce HealthyWage to continue entering into agreements with him.   Defendants'

12   conduct caused HealthyWage lost revenue, lost opportunities, to fall behind

13   competitors, and damage to client relationships.   Moreover, HealthyWage is now

14   saddled with a Website that requires numerous expensive repairs to allow it to

15   function and be further developed.   Consequently, HealthyWage seeks

16   compensatory and consequential damages due to Defendants' breaches of contracts,

17   compensatory, consequential, and punitive damages due to Jagetia's intentional

18   misrepresentations, and a judgment declaring that it does not owe any additional

19   payment to Defendants under the agreements.

20

21

DINSMORE &
SHOHL LLP
SAN DIEGO

2
**COMPLAINT**

**PARTIES**

2.     Plaintiff HealthyWage is a Delaware limited liability company with its principal place of business at 24 West 55th Street, New York, New York 10019.

3.     Defendant Jagetia is an individual domiciled in Escondido, California. He is an Indian national and a permanent resident of the United States.

4.     Defendant Tekpalette is an Indian technology company with, upon information and belief, a principal place of business at 54, Main Sector, Kashipuri, Shastri Nagar, Bhilwara, Rajasthan 311001 India.

**JURISDICTION AND VENUE**

5.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000.

6.     This Court has personal jurisdiction over Defendant Jagetia because he resides in Escondido, California.

7.     This Court has personal jurisdiction over Defendant Tekpalette because Tekpalette has intentionally conducted business in California with Jagetia, a California resident, and Plaintiff's claims arise out of the conduct Tekpalette conducted in California.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of Defendants' acts or omissions giving rise to this lawsuit occurred in this district and because Jagetia resides in this district.

DINSMORE &
SHOHL LLP
SAN DIEGO

3
**COMPLAINT**

**BACKGROUND**

9.     HealthyWage began working with Jagetia in 2010 in relation to software development for its wellness programs.

10.     In 2013, HealthyWage hired a separate development firm to build its new website ("Website").

11.     That same year, in relation to the Website, HealthyWage asked Jagetia to handle the Website development and related software engineering and development work ("Software Development"), what is referred to in the industry as "DevOps," which includes hardware configurations, managing the relationship between the hardware and the software, maintaining uptime for the Website, and managing security, and other related projects.

12.     Jagetia agreed.  Under a series of verbal agreements between HealthyWage and Jagetia, Jagetia performed part of the Software Development, managed all Software Development, and provided consulting and DevOps work in relation to HealthyWage's Website.  Jagetia subcontracted with Tekpalette to shoulder part of the Software Development.  Upon information and belief, Jagetia and Tekpalette entered into an agreement or series of agreements to perform the work relating to HealthyWage's Website.  Because Jagetia and Tekpalette intended their agreement(s) to benefit HealthyWage and its Website, HealthyWage is a third party beneficiary of the agreement(s) and may enforce them.

/ / /

13.     Throughout HealthyWage and Jagetia's business relationship, HealthyWage would ask Jagetia to perform certain projects.  HealthyWage paid for Jagetia and Tekpalette's work at an hourly rate multiplied by the number of hours worked, subject to cuts and discounts based on, among other things, whether a project was ultimately completed properly, the quality of the work, whether the number of hours ultimately worked were necessary or resulted from mistakes made by Jagetia or Tekpalette, and whether Jagetia and Tekpalette met deadlines. HealthyWage did not agree to pay for hours that Jagetia or Tekpalette billed but did not actually work.  HealthyWage and Jagetia agreed HealthyWage would only pay for work after both Jagetia and HealthyWage applied cuts for tardy, overbilled, or unsatisfactory work.   At Jagetia's direction, HealthyWage made payments to Jagetia or Tekpalette for the work performed.

14.     As part of the agreements between HealthyWage and Jagetia, Jagetia agreed that he and Tekpalette would provide code that was secure, scalable, properly organized, well-commented, and otherwise consistent with industry standards.

15.     HealthyWage, Jagetia, and Tekpalette operated in this manner from 2013 to April 2017.  At the end of each year from 2013 to 2016, HealthyWage, Jagetia, and Tekpalette would settle all debts and disputes so the Parties could close their books for the year.   This process involved making sure all outstanding amounts due from HealthyWage to Jagetia and Tekpalette for the year were paid in

1  full.  At this time, HealthyWage would occasionally pay Jagetia a bonus for work

2  performed.

3      16.     From 2013 to April 2017, however, Jagetia and Tekpalette's work

4  product declined in quality.  As a result, HealthyWage's Website crashed with

5  increasing frequency.  Its page load performance steadily slowed.  The Website

6  became increasingly fragile, which caused further web development to become

7  more likely to contain bugs and result in crashes.  The Website also decreased in its

8  scalability, meaning that, as HealthyWage grew, the software and database queries

9  could not support the increased number of HealthyWage users.    Moreover,

10  Defendants caused HealthyWage's Website to become unnecessarily complex,

11  which made further development by Jagetia, Tekpalette, or any other development

12  firm more difficult, time consuming, and costly than necessary.  Moreover, Jagetia

13  and Tekpalette's delivery time and billed hours far exceeded industry standards,

14  resulting in unacceptable delays and massive overbilling.    Further, upon

15  information and belief, Tekpalette and Jagetia billed for many hours that they did

16  not actually work.  HealthyWage estimates that the cost of invoice payments paid to

17  Jagetia and Tekpalette for work that did not meet industry standards and for hours

18  that were billed but not actually worked totals approximately $627,800.

19      17.     Upon information and belief, these problems resulted from Jagetia's

20  failure to provide the requisite diligence in the DevOps work and Software

21

DINSMORE &
SHOHL LLP
SAN DIEGO

**COMPLAINT**

1    Development management and implementation, and Jagetia and Tekpalette's

2    collective failure to staff projects with qualified, experienced personnel.

3         18.    These problems caused HealthyWage harm.  Jagetia and Tekpalette's

4    failure to deliver product that met industry standards, as promised, caused

5    HealthyWage lost revenue, lost opportunities, to fall behind competitors, and

6    damage to client relationships.  HealthyWage estimates that the lost revenue and

7    damaged client relationships caused HealthyWage approximately $265,000 in

8    damage.  Moreover, HealthyWage is left with a Website that requires numerous

9    expensive repairs just to allow it to function and be further developed.

10        19.    As the quality of Jagetia and Tekpalette's work product declined, and

11   HealthyWage's Website declined along with it, HealthyWage raised its concerns

12   with Jagetia and Tekpalette.  In response, Jagetia repeatedly assured HealthyWage

13   that Defendants' work met industry standards and/or that he was remedying the

14   issues to induce HealthyWage to continue working with Defendants and to enter

15   into further agreements for projects.  For example, during telephone conferences on

16   June 15, 2016, July 6, 2016 and October 5, 2016, Jagetia assured HealthyWage that

17   the software he and Tekpalette provided complied with industry standards.  In

18   reality, the software fell far short of industry standards, and, upon information and

19   belief, Jagetia knew the software fell short of industry standards when he made the

20   statements.  Additionally, on many occasions, including telephone conferences on

21   May 11, 2016, June 22, 2016 and July 20, 2016, Jagetia told HealthyWage that

DINSMORE &
SHOHL LLP
SAN DIEGO

7
**COMPLAINT**

Defendants were in the process of hiring a larger and more competent team, including senior Python developers, to improve the quality of the work product. Upon information and belief, Jagetia knew these statements to be false when he made them as Defendants were not in fact hiring a more competent team or any senior Python developers.

20.    HealthyWage reasonably relied on Jagetia's statements based on its long-standing relationship (since 2010) with, and resulting trust in, Jagetia.

21.    Upon information and belief, Jagetia intended for HealthyWage to rely on these statement so that HealthyWage would continue to enter into agreements with him.  He financially benefited from HealthyWage's reliance on his statements as they prompted HealthyWage to enter into additional agreements with Jagetia, under which he received payment for substandard work.

22.    Jagetia's intentional misrepresentations harmed HealthyWage.  They caused HealthyWage to continue entering into agreements with Jagetia despite Jagetia's substandard work product.  They prolonged and aggravated the damage to HealthyWage caused by Jagetia and Tekpalette's substandard work beyond what would have occurred had Jagetia not made the misrepresentations.

23.    However, in December 2016, HealthyWage began to realize Jagetia's prior representations regarding the quality of Defendants' work and his plans to improve his work product were false.  In response to HealthyWage's insistence that the product improve or HealthyWage would terminate its relationship with

DINSMORE &
SHOHL LLP
SAN DIEGO

8
**COMPLAINT**

Defendants, Defendants began demanding payment from HealthyWage far beyond what the Parties had ever agreed to. Jagetia and Tekpalette claimed this additional payment was for work performed in previous years, in addition to recent work. These demands for payment were inadequately supported by Jagetia and Tekpalette's records, inconsistent with the Parties' practice of closing their books and settling debts at the end of each calendar year, and ignored the Parties' prior practice of applying cuts for tardy, overbilled, or unsatisfactory work prior to payment.

24.   In March 2017, HealthyWage hired Diceus, a web development firm, to conduct a code audit and review Tekpalette and Jagetia's prior work. The audit revealed extensive mistakes in the software developed by Jagetia and Tekpalette, including major security vulnerabilities that Tekpalette and Jagetia introduced and/or did not repair for a long period of time.

25.   On April 3, 2017, HealthyWage terminated its relationship with Jagetia and turned over Software Development and DevOps responsibilities to Diceus. In response, Defendants increased their meritless and fabricated demands for payment.

26.   To obtain a functional Website that can effectively and efficiently be developed in the future, HealthyWage must pay Diceus at least $185,000 to perform a wide range of code rewrites and refactoring to ensure that the code going forward will be secure, scalable and not fragile. The rewrite is expensive both in

DINSMORE &
SHOHL LLP
SAN DIEGO

**COMPLAINT**

terms of its direct cost and the cost of the opportunities HealthyWage continues to lose in the interim.  Had Jagetia and Tekpalette provided work product that met industry standards as required under the agreements, HealthyWage would not need to pay Diceus to fix its Website.

## COUNT ONE

## BREACH OF CONTRACT

## (AGAINST ALL DEFENDANTS)

27.    Paragraphs 1 through 26 are incorporated by reference in support of this claim for relief.

28.    HealthyWage and Jagetia entered into a series of verbal agreements by which Jagetia performed services and produced product for HealthyWage in exchange for payment.  As part of the agreements between HealthyWage and Jagetia, Jagetia promised that Jagetia and Tekpalette would provide code that was secure, scalable, properly organized, well-commented, and otherwise consistent with industry standards.

29.    In addition, Jagetia subcontracted parts of the projects to Tekpalette. Upon information and belief, Jagetia and Tekpalette entered into an agreement or a series of agreements in relation to HealthyWage's Website.  Because Jagetia and Tekpalette intended their agreement(s) to benefit HealthyWage and its Website, HealthyWage is a third party beneficiary of the agreement(s) and may enforce them. Upon information and belief, under those agreements, Tekpalette agreed to

10
**COMPLAINT**

1 provide code that was secure, scalable, properly organized, well-commented, and

2 otherwise consistent with industry standards.

3     30.    From 2013 to April 2017, HealthyWage performed under the

4 agreements, making payment to Jagetia or Tekpalette as agreed upon by the Parties.

5     31.    Jagetia and Tekpalette each breached these agreements by providing

6 work product that did not meet industry standards, causing HealthyWage's Website

7 to crash on numerous occasions, experience slow page load times, become

8 increasingly fragile and unnecessarily complex,  and experience a decline in its

9 scalability.  Moreover, Jagetia and Tekpalette's delivery time and billed hours far

10 exceeded industry standards, resulting in unacceptable delays and overbilling.  The

11 Software Development practices, hardware configurations, and software that

12 Jagetia and Tekpalette actually provided were not secure, well-organized or well-

13 commented, and were otherwise inconsistent with and inferior to the promised

14 industry standards.

15     32.    Jagetia and Tekpalette's breaches caused HealthyWage harm in an

16 amount to be proven at trial.  Jagetia and Tekpalette's failure to deliver work

17 product as promised caused HealthyWage lost revenue, lost opportunities, to fall

18 behind competitors, and damage to client relationships.  HealthyWage estimates

19 that the cost of invoice payments paid to Jagetia and Tekpalette for work that did

20 not meet industry standards and for hours that were billed but not actually worked

21 totals approximately $627,800.  Moreover, HealthyWage estimates that the lost

DINSMORE &
SHOHL LLP
SAN DIEGO

11
**COMPLAINT**

1    revenue and damaged client relationships caused HealthyWage approximately

2    $265,000 in damage.   In addition, HealthyWage is left with software that now

3    requires many expensive repairs just to allow it to function and be further

4    developed.   HealthyWage must pay Diceus at least $185,000 to perform a wide

5    range of code rewrites and refactoring to ensure that the code going forward will be

6    secure, scalable and not fragile.   The rewrite is expensive both in terms of its direct

7    cost and the cost of the opportunities HealthyWage continues to lose in the interim.

8                                    **COUNT TWO**

9                       **INTENTIONAL MISREPRESENTATION**

10                        **(AGAINST DEFENDANT JAGETIA)**

11           33.     Paragraphs 1 through 32 are incorporated by reference in support of

12    this claim for relief.

13           34.     As the quality of Jagetia and Tekpalette's work product declined, and

14    HealthyWage's Website declined along with it, HealthyWage raised its concerns

15    with Jagetia and Tekpalette.   In response, Jagetia repeatedly assured HealthyWage

16    that Defendants' work met industry standards and/or that he was remedying the

17    issues to induce HealthyWage to continue working with Defendants and to enter

18    into further agreements for projects.   For example, during telephone conferences on

19    June 15, 2016, July 6, 2016 and October 5, 2016, Jagetia assured HealthyWage that

20    the software he and Tekpalette provided complied with industry standards.   In

21    reality, the software fell far short of industry standards, and, upon information and

1  belief, Jagetia knew the software fell short of industry standards when he made the

2  statements.  Additionally, on many occasions, including telephone conferences on

3  May 11, 2016, June 22, 2016 and July 20, 2016, Jagetia told HealthyWage that

4  Defendants were in the process of hiring a larger and more competent team,

5  including senior Python developers, to improve the quality of the work product.

6  Upon information and belief, Jagetia knew these statements to be false when he

7  made them as Defendants were not in fact hiring a more competent team or <u>any</u>

8  senior Python developers.

9       35.    HealthyWage reasonably relied on Jagetia's statements based on its

10 long-standing relationship (since 2010) with, and resulting trust in, Jagetia.

11      36.    Upon information and belief, Jagetia intended for HealthyWage to rely

12 on these statements so that HealthyWage would continue to enter into agreements

13 with him.  He financially benefited from HealthyWage's reliance on his statements

14 as they prompted HealthyWage to enter into additional agreements with Jagetia,

15 under which he received payment for substandard work.

16      37.    Jagetia's intentional misrepresentations harmed HealthyWage.  They

17 caused HealthyWage to continue entering into agreements with Jagetia despite

18 Jagetia's substandard work product.  They prolonged and aggravated the damage to

19 HealthyWage caused by Jagetia and Tekpalette's substandard work beyond what

20 would have occurred had Jagetia not made the misrepresentations.

21 ///

DINSMORE &
SHOHL LLP
SAN DIEGO

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**COUNT THREE**

**NEGLIGENT MISREPRESENTATION**

**(AGAINST DEFENDANT JAGETIA)**

38.  Paragraphs 1 through 37 are incorporated by reference in support of this claim for relief.

39.  To cause HealthyWage to continue entering into agreements with Defendants, Jagetia made statements to HealthyWage on at least June 15, 2016, July 6, 2016 and October 5, 2016 that the software he and Tekpalette provided complied with industry standards.  In reality, the software fell far short of industry standards.

40.  Jagetia made these statements without exercising reasonable care to ensure product provided by Tekpalette and himself did in fact meet industry standards, particularly where HealthyWage experienced so many problems with the product Defendants provided to it.

41.  HealthyWage reasonably relied on Jagetia's statements based on its long-standing relationship (since 2010) with, and resulting trust in, Jagetia.

42.  Upon information and belief, Jagetia intended for HealthyWage to rely on these statements so that HealthyWage would continue to enter into agreements with him.  He financially benefited from HealthyWage's reliance on his statements as they prompted HealthyWage to enter into additional agreements with Jagetia, under which he received payment for substandard work.

DINSMORE &
SHOHL LLP
SAN DIEGO

14

**COMPLAINT**

43. Jagetia's negligent misrepresentations harmed HealthyWage. They caused HealthyWage to continue entering into agreements with Jagetia despite Jagetia's substandard work product. They prolonged and aggravated the damage to HealthyWage caused by Jagetia and Tekpalette's substandard work beyond what would have occurred had Jagetia not made the misrepresentations.

## COUNT FOUR

## NEGLIGENCE

## (AGAINST ALL DEFENDANTS)

44. Paragraphs 1 through 43 are incorporated by reference in support of this claim for relief

45. Jagetia and Tekpalette had a duty to exercise a reasonable standard of care in the performance of their work for HealthyWage, which included providing at least the bare minimum quality coding, architecture, queries, DevOps, scalability, security, *etc.*

46. Jagetia and Tekpalette breached that duty. Jagetia failed to provide the requisite diligence in the DevOps work and Software Development management and implementation, and Jagetia and Tekpalette's collectively failed to staff projects with qualified, experienced personnel.

47. As a result, HealthyWage's Website crashed with increasing frequency. Its page load performance steadily slowed. The Website became increasingly fragile, which caused further web development to become more likely

DINSMORE &
SHOHL LLP
SAN DIEGO

15

COMPLAINT

to contain bugs and result in crashes. The Website also decreased in its scalability, meaning that, as HealthyWage grew, the software and database queries could not support the increased number of HealthyWage users. Moreover, Defendants caused HealthyWage's Website to become unnecessarily complex, which made further development by Jagetia, Tekpalette, or any other development firm more difficult, time consuming, and costly than necessary. Jagetia and Tekpalette's delivery time and billed hours far exceeded industry standards, resulting in unacceptable delays and massive overbilling. Further, upon information and belief, Tekpalette and Jagetia billed for many hours that they did not actually work.

48. These problems caused HealthyWage harm. Jagetia and Tekpalette's failure to exercise a reasonable standard of care caused HealthyWage lost revenue, lost opportunities, to fall behind competitors, and damage to client relationships. HealthyWage estimates that the cost of invoice payments paid to Jagetia and Tekpalette for work that did not meet a reasonable standard of care totals approximately $627,800. HealthyWage estimates that the lost revenue and damaged client relationships caused HealthyWage approximately $265,000 in damage.

49. Moreover, HealthyWage is left with a Website that requires numerous expensive repairs just to allow it to function and be further developed. To obtain a functional Website that can effectively and efficiently be developed in the future, HealthyWage must pay Diceus at least $185,000 to perform a wide range of code

rewrites and refactoring to ensure that the code going forward will be secure, scalable and not fragile. The rewrite is expensive both in terms of its direct cost and the cost of the opportunities HealthyWage continues to lose in the interim. Had Jagetia and Tekpalette exercised the reasonable standard of care as required under the agreements, HealthyWage would not need to pay Diceus to fix its Website.

## COUNT FIVE

### DECLARATORY JUDGMENT

### (AGAINST ALL DEFENDANTS)

50.     Paragraphs 1 through 49 are incorporated by reference in support of this claim for relief.

51.     HealthyWage made payments to Jagetia and Tekpalette, at the direction of Jagetia, in amounts agreed upon among the Parties. Despite this, beginning in December 2016, Tekpalette and Jagetia began demanding additional compensation allegedly based on work previously performed. These demands for payment were inadequately supported by Jagetia and Tekpalette's records, inconsistent with the Parties' practice of closing their books and settling debts at the end of each calendar year, and ignored the Parties' prior practice of applying cuts for tardy, overbilled, or unsatisfactory work prior to payment.

52.     HealthyWage does not owe Tekpalette any compensation because HealthyWage never entered into any agreement with Tekpalette.

1    53.    HealthyWage vehemently disputes that it owes Jagetia and Tekpalette

2    any further payment under the agreements between Jagetia and HealthyWage, and

3    between Jagetia and Tekpalette.   As such, an actual case and controversy exists.

4    54.    HealthyWage seeks a judgment declaring that HealthyWage does not

5    owe any additional payment to Tekpalette or Jagetia under any agreement.

6                              **PRAYER FOR RELIEF**

7    WHEREFORE, HealthyWage prays for judgment as follows:

8    1.    That the Court enter judgment in favor of HealthyWage;

9    2.    For an award of compensatory and consequential damages in the sum of at

10   least $1,077,800, together with interest thereon at the legal rate, which shall accrue

11   until paid, and in an amount to be proven at trial;

12   3.    For punitive damages;

13   4.    For a judgment declaring that HealthyWage does not owe any additional

14   money to Tekpalette or Jagetia under any agreement; and

15   5.    For such other and further relief as the court deems just and proper.

16   Dated:  May 22, 2017                    Respectfully submitted,

17                                           */s/ Joseph S. Leventhal*
                                             Joseph S. Leventhal (221043)
18                                           joseph.leventhal@dinsmore.com
                                             DINSMORE & SHOHL LLP
19                                           655 W.  Broadway, Suite 840
                                             San Diego, California 92101
20                                           Telephone:(619) 400-0500
                                             Facsimile: (619) 400-0501
21                                           *Attorneys for Plaintiff HealthyWage LLC*

DINSMORE &
SHOHL LLP
SAN DIEGO

18
**COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2          Plaintiff HealthyWage hereby demands trial by jury in this action.

3    Dated:  May 22, 2017                    Respectfully submitted,

4                                            */s/ Joseph S. Leventhal*
                                             Joseph S. Leventhal (221043)
5                                            joseph.leventhal@dinsmore.com
                                             DINSMORE & SHOHL LLP
6                                            655 W.  Broadway, Suite 840
                                             San Diego, California 92101
7                                            Telephone:(619) 356-3518
                                             Facsimile: (619) 615-2082
8
                                             *Attorneys for Plaintiff HealthyWage LLC*
9

10

11

12

13

14

15

16

17

18

19

20

21

DINSMORE &
SHOHL LLP
SAN DIEGO

**COMPLAINT**